UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,                :

                Plaintiff,         :

           05 Cr. 376 (CSH)

   -against-                                       :

           OPINION AND ORDER

CHRISTY LANDRY,                             :

                Defendant.     :
-------------------------------------------------------X

HAIGHT, Senior United States District Judge:

In this prosecution for wire fraud, the government moves *in limine* to preclude counsel for the defendant during cross-examination of a proposed government witness from inquiring into or mentioning that witness's psychological and mental condition, as revealed by documents that have come into the parties' attention. Defendant opposes the motion.

### I. BACKGROUND

The superseding indictment describes the conduct of a number of individuals acting in furtherance of several separate conspiracies to defraud investors. One of these individuals is the defendant awaiting trial, Christy Landry. The indictment refers to other individuals as "CCs," shorthand for "co-conspirator," followed by a number. CC-1 is described as "an attorney residing in Scottsdale, Arizona." Indictment, ¶ 2.

That Arizona attorney is J. Michael Donahoe. On September 26, 2003, Donahoe pleaded guilty in this District before Magistrate Judge Francis to an information in a related case bearing docket number 03 Cr. 1167. Specifically, Donahoe pleaded guilty to one count of conspiracy to

1

commit wire fraud and two substantive counts of wire fraud. During his allocution Donahoe gave this account of his actions to Judge Francis:

> As far as the first two counts, you Honor, basically I was involved here, in Arizona actually, where we had a gentleman from England who asked me to receive wire-transferred funds from various clients throughout the United States for the purpose of entering those funds into what they referred to as high-yield trade programs. I agreed to do that, and I then transferred money to him, and we continued that, receiving moneys from those folks that he would ask to send money, and I would send letters supporting him in that regards [*sic*]. That was in regards to, I believe, Counts 1 and 2. I knew at the time that the investments – I had very good reason to know that the investments that he talked about were not true but rather were fraudulent.

Tr. 10-11. Donahoe told Judge Francis that these acts took place between about June 2001 and March 2002. *Id*. at 11. Donahoe then said:

> As to Count 3, I was contacted by a gentleman in New York who indicated to me that he had an investor who wanted to put up about 5 and three quarter millions of dollars and that I was to purchase credit facilities that again would be involved in the high-yield programs, which I discovered to be false but continued with the charade that that was correct and the funds were spent.

*Id*. Judge Francis accepted Donahoe's plea. Donahoe has entered into a cooperation agreement with the government, which intends to call him as a witness at Landry's trial.

Landry is a woman. In his allocution before Judge Francis, Donahoe mentioned his interactions with two men in furtherance of the charged conspiracies but did not refer to a woman co-conspirator. However, the indictment in the instant case charges that Landry interacted with a number of co-conspirators, including "CC-1" (Donahoe), in furtherance of specified schemes that are clearly the same schemes Donahoe described in his plea allocution.

In its letter brief supporting the present motion to limit defense cross-examination of

Donahoe, the government summarizes the testimony it anticipates eliciting from him at Landry's trial:

> The Government anticipates that Donahoe would testify, *inter alia*, about his personal dealings with the defendant [Landry] during the time frame of Counts One and Two. He would testify that the defendant was the initial solicitor of many of the victims of the fraud – victims who gave money as early as March 2001, and as late as October 2001; that he and the defendant had numerous conversations during the conspiracy's existence about the fact that the victims were not obtaining what they had paid for, and that their monies had been used for purposes other than what was represented. Donahoe would also discuss numerous documents and other materials that the defendant received, created or otherwise directly discussed with Donahoe, all of which, the Government will submit, demonstrates that the defendant was a knowing participant in the fraud schemes charged in Counts One and Two.

Government's Letter Brief dated November 3, 2005 at 2-3.

The government also expects Donahoe "to testify to facts relating to Counts Three through Eight as well, in more limited scope." Letter Brief at 3. Counts Three through Eight "pertain to fraud schemes that were perpetrated from in or about January 2003 through in or about February 2004 (in the case of Count Three), and from late 2004 through early 2005 (in the case of Counts Four through Eight), either by the defendant acting with other co-conspirators (Count Three), or by the defendant on her own (Counts Four through Eight) . . ." *Id*. As to these counts

> Donahoe would testify that, subsequent to participating in the crimes charged in Counts One and Two, he entered a plea of guilty to felony charges and became a Government cooperator, and in that capacity, he participated in several consensually recorded conversations with certain of the defendant's then co-conspirators. The Government anticipates introducing in evidence certain of these recordings, and plans to authenticate those recordings through Donahoe's testimony.

*Id*. As previously noted, Donahoe entered that plea of guilty before Judge Francis on September 26,

2003.

Landry's trial was scheduled to begin in mid-October. Shortly before the trial date, the government advised the Court and defense counsel that it had just learned that Donahoe had been involved in some sort of proceeding before the Arizona State Bar Association that might bear upon the reliability of his trial testimony. The parties and the Court agreed that the trial should be adjourned until the pertinent documents had been received from Arizona and examined by the prosecutors and defense counsel, who would then be in a position to make such applications to the Court as they might think appropriate. As an enclosure to a letter dated October 21, 2005, the Disciplinary Clerk of the Supreme Court of Arizona sent to the government Donahoe's "disability file." That file has been examined by counsel for the parties and subsequently by the Court. Its contents give rise to the government's present motion to preclude defense counsel's cross-examination of Donahoe in certain respects.

The file reveals that Arizona counsel for Donahoe filed with the Disciplinary Commission of the Supreme Court of Arizona a Petition for Transfer to Disability Inactive Status. The petition was dated September 3, 2002 and recited that Donahoe was admitted to the Arizona Bar in 1972 and his license to practice had been suspended for non-payment of dues required by the Supreme Court's rules. The petition asserted that "[b]ecause of mental infirmity, [Donahoe] is presently 'disabled' as that term is defined in Supreme Court Rule 59(b)(1)(B)." P. 3766 ¶ 3.[1] In support of that assertion, counsel for Donahoe attached to the petition an evaluation dated August 20, 2002 by Dr. David Leighton. Dr. Leighton, whose doctorate is a Ph.D., is a "clinical

---

[1] The page references are to the Bates numbers appearing on the file.

psychologist/neuropsychologist."[2]

I need not describe in detail the voluminous file generated by Donahoe's petition. It is sufficient for present purposes to note that Arizona Supreme Court Rule 59(b)(1)(B), which Donahoe invoked in aid of his petition to be transferred from suspended status as an attorney to disability inactive status by reason of "mental infirmity," provided in pertinent part:

> A lawyer shall be transferred to [disability] status upon proof which shall include a relevant medical specialty evaluation that, as a result of mental or physical illness or infirmity . . . the person lacks the capacity to discharge adequately his or her duty to clients, the bar, the courts or the public.

It appears from the file that under Arizona procedure, the State Bar Association either agrees to such a petition and stipulates that the petitioning attorney is disabled within the rule, or disagrees and opposes the petition. In Donahoe's case the Association opposed his petition. That led to an evidentiary hearing before a Hearing Officer of the Supreme Court, a report and recommendation by the Disciplinary Commission of the Court recommending that Donahoe's petition be granted,[3] and an order by Supreme Court dated September 28, 2005 granting the petition.

Three experts who had examined Donahoe testified at the evidentiary hearing. One was Dr. Leighton, previously identified in text. The second was Irna Lynn Wolf, Ph.D., a "cognitive psychologist." A representative of the State Bar Association asked Dr. Wolf to evaluate Donahoe. P. 4199-4200. The third was H. Daniel Blackwood, Ph.D., a diplomate in "clinical neuropsychology," who was asked to evaluate Donahoe by Douglas Brooks, a Disciplinary Clerk of the Supreme Court. P. 3884-3885.

---

[2] That is the description appearing at the head of Dr. Leighton's stationery.

[3] The Commission was divided in its report. Three members dissented.

Prior to their testimony, Drs. Leighton, Wolf and Blackwood submitted written reports, dated August 2, 2002, March 19, 2003 and an undecipherable date in September 2003, respectively. The three witnesses' reports and their testimony describe at length the batteries of psychological tests they administered to Donahoe in the course of their evaluations. Psychologists understand the language they are speaking. The lay reader can find their terminology daunting. The three psychologists who examined Donahoe appear to agree that he suffers from ADD (attention deficit disorder) or ADHD (attention deficit hyperactive disorder), but they disagree on the disabling effect of the condition. Thus the government correctly states that Drs. Leighton and Wolf concluded "that Donahoe was 'disabled' as defined under" the Arizona Supreme Court Rule, Letter Brief at 5, and that Dr. Blackwood concluded that Donahoe's test results "do not support a disability status," *id*. at 17 (citing to the state proceeding record).

The government devotes pages 6-17 of its single-spaced letter brief to arguing that Leighton and Wolf were wrong and Blackwood was right, and, by implication, the Disciplinary Commission majority and the Arizona Supreme Court erred in granting Donahoe disability status. If that argument is intended as an invitation to this Court to review the question *de novo*, I decline it. The question presented by the government's motion to limit the cross-examination of Donahoe at Landry's trial is whether Landry's right to a fair trial entitles her counsel to use during that cross-examination material from the file generated by Donahoe's disability petition.

That question is presented most forcefully by the written report Dr. Wolf prepared after examining and testing Donahoe on three days in March 2003. Her report states at page 11 (P. 3836):

> Delayed recall of visual information showed good retention of faces that were previously learned, but consistently poor recall in family scenes. In this regard, Mr. Donahoe's performance was characterized

6

>by source memory difficulties. That is, he confused information specific to the different scenes, recalling information from one scene, when asked to give information from another. This aspect of his memory function represents a significant impairment that is masked by averaging his performance across different tests to produce a global General Memory Index.

On the same page of her report, Dr. Wolf describes another test she administered to Donahoe which "evidenced significant source memory difficulties . . . " Her report continues:

> These difficulties signify serious memory impairment that has the potential to substantially impact his learning and recall performance to a degree that might not be anticipated given the illusion of normal ability suggested by his composite memory scores.

Dr. Wolf's report at page 17 (P. 3842 in the file) also states:

> The most notable problem to emerge on the current assessment, however, is a source memory deficit, which was pervasive across both verbal and nonverbal domains. Source errors were noteworthy on recall of information contained in family scenes and on recall of word lists. This difficulty signifies a serious encoding and storage problem stemming from susceptibility to interference from other memory sources with concomitant confabulatory tendencies. This means, that while Mr. Donahoe may adequately remember information that is encoded for subsequent retrieval, the source of the information to be remembered is not retained and thus the integrity of the memory process is compromised.

This lay reader does not pretend to fully understand all the words and concepts contained in these densely packed paragraphs, or the several references in the reports and testimony of the other two psychologists to Donahoe's powers of memory.[4] The legal profession does not hold a monopoly

---

[4] In addition, Dr. Blackwood, upon whose opinions the government places its principal reliance, recounts in his report at pages 4 and 6 Donahoe's description of his attention span difficulties: "In discussing possible ADD, he stated that he thinks this goes back to his 'disjointed childhood,' although he does believe that his attention span is 'pretty pathetic,' and that it is impeding his judgment. As an example, he stated that when doing a trust for a woman he moved his office several times and lost the papers. . . . He reports that his attention and impulsivity problems sometimes interfere with his work activity and significantly interfere

7

on professional jargon. However, neither the Court's perhaps imperfect comprehension nor the government's critiques of the three psychologists' reports are dispositive of the present motion, which turns upon whether Donahoe's disability petition and the psychological examinations it triggered furnish appropriate grist for a cross-examiner's mill.

## II. DISCUSSION

The leading Second Circuit case on point remains *United States v. Sasso*, 59 F.3d 341 (2d Cir. 1995), where the court held that "[e]vidence of a witness's psychological history may be admissible when it goes to her credibility." *Id*. at 347. For that proposition Judge Kearse's opinion cites Fed.R.Evid. 611(b), which provides generally that cross-examination "should be limited to the subject matter of the direct examination *and matters affecting the credibility of the witness*." (emphasis added). In assessing the probative value of a psychological history, "the court should consider such factors as the nature of the psychological problem, the temporal recency or remoteness of the history, and whether the witness suffered from the problem at the time of the events to which she is to testify, so that it may have affected her 'ability to perceive or recall events or to testify accurately.'" *Id*. at 347-48 (citing and quoting *United States v. Butt*, 955 F.2d 77, 82 (1st Cir. 1992)) (other citations omitted). The trial court "has discretion to limit such evidence if it determines that the probative value of the evidence is outweighed by its potential for unfair prejudice, confusion of the issues, or waste of time." *Id*. at 348 (citing Fed.R.Evid. 403). In *Sasso,* the Second Circuit

---

particularly with management of time, meeting deadlines, and in operating work related equipment." Donahoe's self-confessed difficulties in preserving a client's papers, managing time, and meeting deadlines may affect his "ability to perceive or recall events or to testify accurately," *United States v. Sasso*, 59 F.3d 341, 348 (2d Cir. 1995) (discussed more fully in Part II, *infra*), a possibility of some significance, given the detailed transactional evidence the government anticipates eliciting from Donahoe at trial.

affirmed the trial judge's refusal to allow defense counsel to "explore" before the jury a government witness's psychiatric treatment and medication for depression resulting from her involvement in an unrelated event, where "there was no indication that [the witness] was delusional, or paranoid, or had any difficulties *in memory* or perception." *Id.* (emphasis added).

In *United States v. Paredes*, No. 99 Cr. 290, 2001 WL 1478810 (S.D.N.Y. Nov. 20, 2001), Judge Leisure applied *Sasso* in allowing defense counsel, over the government's objection, to cross-examine a government witness about her psychological condition. This was a drug prosecution. A proposed government witness, Carly Charles, "began suffering anxiety attacks approximately 6 to 8 months after her husband, Gregory Charles, was arrested in May of 1998, and after seeing a doctor, she began taking medication for her condition." 2001 WL 1478810, at *1. Judge Leisure, having reviewed the medical file *in camera*, concluded that the witness's medical history "does not indicate any paranoid or delusional tendencies, but rather anxiety problems, including panic attacks, and depression." *Id.*, at *2. However, the absence of paranoia or delusional tendencies was not dispositive; Judge Leisure noted that "the government concedes that Charles's psychological condition existed during at least some of the events which she is expected to testify about," thereby justifying the conclusion that "Charles's condition might affect her ability to testify accurately regarding those events." *Id*. The court further reasoned that "the defendant's opportunity to cross-examine Charles regarding her psychological condition may prove important to assessing her credibility, especially because Charles is one of only three witnesses the government apparently plans to call," and a defendant's Sixth Amendment Confrontation Clause right to cross-examine "is heightened when the witness is an accomplice whose testimony could implicate the defendant as a fellow malefactor." *Id*. (citing *United States v. Kyles*, 40 F.3d 519, 526 (2d Cir. 1994). All three of

9

these circumstances appear to apply to Donahoe's anticipated testimony against Landry. In *Paredes* Judge Leisure allowed "the defendant to cross-examine Carly Charles regarding her psychological condition," and directed the government to produce her medical records to defendant, with non-psychological information redacted.[5]

*Butt*, the First Circuit case that the Second Circuit quoted with approval in *Sasso*, furnishes some useful insights. Two police officers were indicted for their participation in a scheme to extort money from prostitutes. The government's key witness, one Nancy Kevorkian, a prostitute who was being extorted by defendants, told a defendant during that time that she had attempted suicide the previous year and as a result had been hospitalized and examined by a psychologist. Alerrted to that circumstance, the government moved before cross-examination of the witness began "to prevent the defense from asking Kevorkian about any aspect of her psychiatric history." 955 F.2d at 86. In the words of the First Circuit, the district court

> refused the government's broad request, ruling that the defense was free to inquire about Kevorkian's psychological background – "the nature of how she was feeling and her psychological problems generally" – including her suicide attempt, hospitalization, and the contents of the psychologist's report, insofar as she had discussed them with defendants.

*Id*. But the trial judge refused a defense request to admit even a redacted copy of the psychological report into evidence, and barred the proffered testimony of two defense psychiatrists about the meaning of certain terms appearing in that report. *Id*. at 80-81.

---

[5] The need for this latter direction does not arise in the case at bar, since the entire file generated by Donahoe's Arizona bar proceeding has already been furnished to defendant's counsel.

On their appeal after conviction, defendants contended that those rulings were erroneous.[6] The First Circuit affirmed. As for the hospitalization report, the trial judge examined it *in camera* and concluded that the report was "not relevant to her credibility, despite the suggestion contained therein that she was mentally unstable at a time covering events about which she later testified." *Id.* at 82. The judge reasoned that the witness's depression, "as described by the examining psychologist in 1987 and as speculated upon by Dr. Green [a defense psychiatrist], was a condition within the norm" and consequently could not support a conclusion that the witness was "mentally incapacitated in any way." *Id*. at 83 (internal quotation marks omitted). Affirming on this point, the First Circuit said:

> We find nothing improper in the trial court's management of this delicate question. Having examined the 1987 report in full, ourselves, we find the court's assessment of it to have been fair. Admittedly, we cannot rule out the possibility of any relationship between Kevorkian's past mental health and her credibility at trial. Her depression may well have colored her perception of reality. The same may be said, though, of most of life's ordeals and of the painful and embarrassing ones, in particular. In ruling Kevorkian's psychological profile not relevant to her veracity, the trial court evidently concluded that a tighter logical nexus was necessary to justify the introduction of such personal and potentially stigmatizing material. While recognizing that another court might have ruled differently, we are unable to find that the district court in this case abused its broad discretion in holding as it did.

*Id.* at 83-84.[7]

---

[6] Interestingly, defendants' counsel "chose not to exercise" the option tendered to them by the trial judge, asking Kevorkian "not one question about her psychological difficulties" during the course of "more than two days of cross-examination." 955 F.2d at 86.

[7] The First Circuit's conclusion on the irrelevance of this psychological report is not surprising, given the court's pronouncement on the prior page of its opinion that "federal courts appear to have found mental instability relevant to credibility only where, during the time frame of the events testified to, the witness exhibited a pronounced disposition to lie or hallucinate, or

11

In affirming the trial judge's refusal to let the defense psychiatrists testify, the First Circuit stressed that "[n]either of the defendants' experts had met Nancy Kevorkian and, consequently, neither was in a position to comment professionally upon her mental health, particularly as it may have been in 1987." 955. F.2d at 85. Moreover, "to the extent that the testimony was, in effect, little more than a verbal rendition of the disclosed portions of the 1987 hospitalization record, it, too, was excludable on relevancy grounds." *Id.*

Turning to the case at bar, the government's position has softened slightly over time. Its *in limine* motion prayed for an Order "precluding the defendant from introducing evidence of, or conducting cross-examination about, Donahoe's psychological condition, and the related Arizona disciplinary proceedings." Letter Brief at 32. At the oral argument on the motion AUSA Siegel said:

> To the extent Mr. Donahoe said to the doctors, you know, I've had memory problems in the past, or I've had problems focusing on things, Mr. Donahoe can be asked about his statements to that effect. The government would object to Mr. Cooper [defense counsel] attempting to put the words of the doctors in the witness's mouth simply because Mr. Donahoe's lawyer filed a brief that quoted those reports. And to the extent that Mr. Cooper would try to do that, the government would object to that. But if Mr. Cooper wants to ask Mr.

---

suffered from a severe illness, such as schizophrenia, that dramatically impaired her ability to perceive and tell the truth." 955 F.2d at 82-83 (collecting cases). In the case at bar, the government applauds that stringent test and argues it controls the case at bar. If I agreed, I would preclude counsel for Landry from introducing the subject, since Donahoe's condition as described by the psychologists' reports comes nowhere near that level of incapacity. But I am not persuaded that this language states the prevailing rule in the Second Circuit, or even in the First Circuit. In *Sasso,* the Second Circuit did not quote this language when it cited *Butt* with approval, contenting itself with the conclusion that a witness's psychological problem is relevant to credibility if it "may have affected her 'ability to perceive or recall events or to testify accurately.'" 59 F.3d at 348. *Sasso* may be read to hold that a defendant is entitled to place before a jury a psychological history if it contains an indication that the witness "had any difficulties in memory." *Id.* As for the First Circuit's opinion in *Butt*, the discussion quoted in text indicates that the court found the relevance of the witness's suicide-related depression a closer question than would be suggested by the preceding language quoted in this footnote.

> Donahoe, did you tell a doctor that you have suffered from some memory problems in 2003, did you tell somebody in 2003 that you suffered some memory problems, the government has no objection to that. The government has an objection to Mr. Cooper trying to quote or paraphrase what the doctors concluded in their reports through the witness.

Tr. 44-45.

Mr. Cooper is not satisfied with the government's minimal concession. At the oral argument he expressed desires to establish on cross-examination Donahoe's disability petition as the context for the psychologists' reports, place those reports before the jury or at least selected passages from them, in the guise of refreshing recollection (counsel understandably focuses upon the report of Dr. Wolf, quoted *supra*), and attempt to demonstrate that Donahoe's disability petition constituted an attempted fraud upon the Arizona bar authorities. For the reasons that follow, I grant some of defense counsel's wishes and reject others.

I begin with the observation that Donahoe's psychological history, as reflected in the psychologists' reports, satisfies all the tests for probative value on the question of his credibility as a trial witness that the Second Circuit articulated in *Sasso* and applied by Judge Leisure in *Paredes*. Those tests include "the nature of the psychological problem," "the temporal recency or remoteness of the history," and "whether the witness suffered from the problem at the time of the events to which [he] is to testify, so that it may have affected [his] ability to perceive or recall events or to testify accurately." 59 F.3d at 347-48. As noted *supra*, the psychological reports contain references to impairments in Donahoe's memory and attention span. Donahoe was evaluated by Drs. Leighton, Wolf and Blackwood during the same period he was acting in furtherance of the fraudulent schemes charged in the indictment, and their reports describe his mental condition at precisely those times.

13

When Dr. Wolf reports that "the integrity of [Donahoe's] memory process is compromised," a question inevitably arises with respect to his ability to recall events or testify about them accurately.

The government contends that this and comparable comments in Donahoe's psychological evaluations are not relevant to his credibility as a trial witness because a different sort of memory is at issue. Having contacted Dr. Blackwood "informally, in anticipation of filing this motion," the government says in its letter brief at 27: "According to Dr. Blackwood, the test results upon which Dr. Wolf relied in diagnosing the 'source memory deficit' test a person's ability to recollect certain random details with which they are presented, but *not* one's ability to recall accurately one's life experiences, which generally flow from a narrative context." (emphasis in original). This is a legitimate argument (although one wonders if the testimony of a co-conspirator describing a sophisticated fraudulent scheme involving a number of conspirators might be compromised by an impaired ability to recall "certain random details"). But nothing in the government's perception of Donahoe's psychological history or Dr. Blackwood's views is sufficient to preclude defense counsel from exploring the question of the witness's powers of recollection on cross-examination.[8] Whether Donahoe's mental condition as revealed by the psychological reports has any effect upon his credibility as a trial witness, and if so to what extent, are questions properly left to the jury.

During his cross-examination of Donahoe, I will allow counsel to proceed in the following

---

[8] The government also says that "should the Court permit inquiry on any aspect of Dr. Wolf's report," the government "has already spoken with Dr. Blackwood on an informal basis, and would expect Dr. Blackwood to testify, in substance, as discussed above." Letter Brief at 30. In a delicately chosen phrase, the government asserts that it would be entitled to do so "to insure that the jury was not left confused." *Id*. Placing this exercise in advocacy to one side, I agree that the government's calling Dr. Blackwood to respond to the pertinent defense cross-examination of Donahoe would be a proper exercise in rebuttal, since Donahoe's psychological history plays no part in the government's case in chief.

manner. Counsel may inquire whether during the time when the conspirators were carrying out their fraudulent scheme (which coincides with Donahoe's disability petition and the psychological evaluations) or at the present time Donahoe experienced or is presently experiencing any lapses or other difficulty with his memory. If counsel is not satisfied with the witness's answers (which would not be surprising), counsel may establish that Donahoe petitioned the Arizona Supreme Court for disability status on the basis of mental infirmity and was evaluated by a particular psychologist or psychologists. Counsel may establish Donahoe's familiarity with the psychologists' reports. Counsel may then read pertinent selections from a report or reports to Donahoe and ask him (a) what he told the psychologists about his condition and history during the evaluations and (b) whether he is aware of the present effect of any of the limitations or disabilities described in the reports. Counsel may mark the reports he wishes to use for identification, but they will not be received in evidence. The government may then reflect upon Donahoe's answers and its own redirect examination, if any, and then decide whether it needs to call Dr. Blackwood on rebuttal.

My reasons for these evidentiary rulings are as follows. I reject the government's effort, expressed during the oral argument, to limit defense counsel to asking Donahoe if in 2003 he told "a doctor" or "somebody" that he "suffered some memory problems." The jury would be left to speculate whether such a declaration took place during an annual physical examination ("a doctor") or during a dinner party ("somebody"). The defendant is entitled to put Donahoe's psychological history in context. Stated otherwise, Donahoe's disability petition provides a necessary background for the psychological evaluations. The government's concern that the different standard of "mental infirmity" contained in the Arizona Supreme Court rules for practice as an attorney would confuse or mislead the jury will be addressed by a limiting instruction I will give to the jury when counsel

begins the limited cross-examination on the issue that I will allow. Moreover, defense counsel will not be permitted to bring out during cross-examination that Donahoe's disability petition was granted, or to refer to that fact during his opening statement or closing argument.

These circumscribed references to Donahoe's disability petition will not unfairly prejudice the government, not only because of the limitations on cross-examination imposed by this Opinion, but also because the fact that Donahoe made the petition could come to the jury's attention in an entirely unrelated fashion. Specifically, it appears that the government knew nothing about the petition until shortly before the trial was scheduled to begin in October of this year, although Donahoe entered his plea before Judge Francis and began cooperating with the government in September 2003. If so advised, defense counsel may legitimately ask whether or not it occurred to Donahoe that the government might be interested in this psychological history of a key witness. That line of inquiry goes to Donahoe's forthrightness and candor with the government, which in turn bears upon his credibility as a trial witness.[9]

The clear implication of the First Circuit's opinion in *Butts* is that the psychological reports in that case would have been admitted into evidence had the condition they described been relevant to the witness's credibility. I have concluded that Donahoe's psychological evaluations have that

---

[9] However, I will not allow defense counsel to confront Donahoe with an answer he gave to Judge Francis during his plea allocution on September 26, 2003. Judge Francis asked Donahoe: "Are you or have you recently been under the care of a doctor or psychiatrist for any reason?" Donahoe answered "yes." Judge Francis's follow-up question was: "For what purpose?" Donahoe responded: "Cardiologist and electrophysiologist for the purpose of defibrillation, and a pacemaker." Judge Francis's inquiries were clearly limited to physicians treating Donahoe at that time, for the purpose of determining Donahoe's competence to plead. The psychologists who evaluated Donahoe for the purpose of his disability petition never treated Donahoe, or placed him "under their care," to paraphrase Judge Francis. Donahoe's response to Judge Francis is not relevant to his credibility as a trial witness and may not be inquired into.

16

relevance, but will not receive them in evidence because the jury should not be asked to try to decipher this sort of prose, much of which has nothing to do with the point at issue. Stated otherwise, receiving the reports themselves into evidence would lead to a confusion of issues and misleading the jury, dangers against which Fed.R.Evid. 403 warns trial judges. But Rule 403 is not implicated by the limited cross-examination which, in the exercise of my discretion, I will allow.

The government makes an *in terrorem* argument against any reference to Donahoe's disability petition, on the ground that it will require testimony from all the psychologists, greatly prolong the trial, and confuse the jury as to the issues. Given the limitations imposed upon the defense, these concerns do not arise. Defense counsel's allowable cross-examination of Donahoe on the point should not take more than an hour. If the government feels compelled by that testimony to call Dr. Blackwood in rebuttal, his testimony will be limited to a critical explanation of whatever psychological opinions the Donahoe cross-examination revealed, and should not consume much time, even allowing for the manner in which psychologists express themselves. In any event, whatever additional time the Court's rulings generate to ensure the fairness of the trial is time well spent.

For the foregoing reasons, the government's motion to preclude cross-examination of its witness J. Michael Donahoe is granted in part and denied in part, and the trial will be conducted in accordance with this Opinion.[10]

---

[10] While during pre-motion exchanges the question of Donahoe's competence to testify as a witness arose, the government is correct in arguing that nothing in the psychologists' reports demonstrates that he is not "competent to be a witness," as that phrase is used in Fed.R.Evid. 601. I do not understand Landry to contend otherwise. The government's motion turns instead upon the relevance of Donahoe's psychological history to his credibility as a witness, a quite different question.

It is SO ORDERED.

Dated: New York, New York
January 4, 2006

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE